1

2

3

4

5

6

7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JARRETT E. KENDIG, | 1:08-cv-01522-JMD-HC |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ORDER DIRECTING CLERK TO ENTER JUDGMENT |
| FRED FIGUEROA, | |
| Respondent. | |

Petitioner Jarrett E. Kendig ("Petitioner") is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**Procedural History**

On September 2, 2004, a jury convicted Petitioner of armed robbery and of being a felon in possession of ammunition.  The jury also found that Petitioner was personally armed during his offense and that his offense was committed while Petitioner was released on bail in connection with another case.

The California Court of Appeal affirmed the relevant portions of Petitioner's conviction on June 16, 2006.[1]  (Lod. Doc. 4).  The California Supreme Court denied Petitioner's petition for review on August 30, 2006.  (Lod. Doc. 6).

///

---

[1] The Court of Appeal reversed Petitioner's conviction for receiving stolen property.

1   The Tulare County Superior Court denied Petitioner's petition for writ of habeas corpus on

2   April 4, 2007.  (Lod. Doc. 8).

3   The California Court of Appeal summarily denied Petitioner's petition for writ of habeas

4   corpus on November 29, 2007.  (Lod. Doc. 10).

5   The California Supreme Court summarily denied Petitioner's petition for writ of habeas

6   corpus on June 11, 2008.  (Lod. Doc. 12).

7   Petitioner filed the instant federal petition for writ of habeas corpus on October 9, 2008.

8   (Doc. 1).  Respondent filed an answer to the petition on April 2, 2009.  (Doc. 15).  Petitioner filed a

9   traverse on June 1, 2009.  (Doc. 19).

10   Both Petitioner and Respondent have consented to Magistrate Jurisdiction pursuant to 28

11   U.S.C. § 636(c)(1).  (Docs. 5, 10).

12   **Factual Background[2]**

13   On the morning of December 7, 2003, David Gong (Gong) was sleeping on the couch
    in his living room in Porterville. Gong suffered from cancer and had just left the
14   hospital. Gong had a prosthetic leg and took off the prosthesis when he slept. He had
    received medication in the hospital and taken cold medication earlier that morning.
15   He had a medical marijuana card and had smoked marijuana the previous night, but
    Gong testified he was not feeling any effects of the medication that morning.
16

17   Around 8:30 a.m., Gong woke up when he thought he heard a car pull into the
    driveway between his house and his neighbor's house. Gong heard voices and thought
    the car probably belonged to his neighbor. He was not feeling well and went back to
18   sleep. A few minutes later, Gong woke up again when he heard his back door kicked
    down. Another door was kicked down and two men entered his house. Gong asked
19   what was going on. The men held guns and flashlights and said, "Sheriff's department,
    don't move, get your hands up." Gong sat up but remained on the sofa because he was
20   not wearing his prosthetic leg.

21   Gong testified he had never seen these men before. Gong testified one man appeared
    Hispanic, dark skinned, about six feet tall, with short hair combed back and a goatee.
22   This man was wearing a black hat that said "ATF" in yellow letters. He was also
    wearing a black cotton vest similar to those worn for fishing, along with black boots,
23   a utility belt similar to those worn by the police, and black gloves. He was holding a
    handgun and flashlight.
24

25   Gong testified the second man was White, about six feet tall and 170 pounds, with
    brown hair combed back and a goatee. He was wearing a long-sleeve black
    sweatshirt, a different type of black microfiber vest with filling that was "kind of
26   poofy" black gloves, black boots, and a police-style utility belt. He also held a

27   _____

28   [2] The Court adopts the California Court of Appeals summary of the facts and evidence as stated in the unpublished decision
    affirming Petitioner's convictions on direct review.

handgun and flashlight. He was not wearing a hat.

At trial, Gong identified appellant as the White gunman who was not wearing a hat, and he was "absolutely positive" about the identification. Gong did not previously know appellant, but appellant stood within one foot of him during the robbery. The gunmen initially forced Gong to lie face-down on the couch, but Gong was able to raise his head and look at their faces. The gunmen repeatedly told Gong to put his head down and not to look at them, but Gong testified he studied the gunmen's faces because he was "already suspicious they weren't sheriff's" and "so I took a look at 'em knowing I was going to have to try to identify 'em or describe 'em to the police."

Gong testified the gunmen were in his house for 10 to 15 minutes. They "zip tied" his hands behind his back with plastic restraints, and they repeatedly asked "where's your dope?" Gong directed them to a bag on the dining room table, which contained four grams of his prescription medical marijuana. The gunmen asked if he wanted them to "bring the dogs in," and Gong said "bring in whoever you want" "there was no dope in my house."

Gong testified the Hispanic gunman held a gun to Gong's head while appellant searched the bedroom. The gunmen then switched places, as appellant held Gong at gunpoint and the Hispanic gunman continued to search the house. Their guns were black and appeared to be semi-automatic small caliber weapons. They called out to each other as "Deputy." Gong heard them search through the entire house. They were cursing and repeatedly ordered Gong not to move or look at them.

The gunmen asked Gong where his money was, and Gong said he did not have any money. Appellant opened a box on a table behind the couch and removed over $ 800. Gong told them the cash was from his Social Security and disability checks, and appellant asked how long he had been disabled. Gong said all his paperwork was in the kitchen. Gong watched as they went through his wallet, which had been on the coffee table. The gunmen discussed whether Gong was restrained well enough so he would stay down, and then they left through the back door.

After the gunmen left, Gong spent about 10 minutes working his way out of the plastic restraints. He took a shower and tried to figure out what happened. He then went through his house to determine if anything was missing. The house was a mess, and all the drawers were open and his things thrown around the rooms. Gong realized the gunmen had taken his wallet, which contained his driver's license and Social Security card, his medical marijuana card, and his insurance and credit cards. They took about 10 Playstation videogames.

Gong also discovered the gunmen took a hand-carved camphor chest from the bedroom, which contained Gong's collection of 400 to 500 comic books. Gong had collected Marvel and DC comic books for 25 years, and primarily owned "X-Men" titles. The comic books were in good condition, and the most valuable books were in plastic covers. Gong testified his collection was worth $ 6,000 to $ 7,000. Gong called the sheriff's department and reported the robbery. He also cancelled his credit cards.

Around 9:35 a.m., Porterville Police Officer Joshua Maniss and two other officers responded to Gong's house. Gong was "very calm" in giving his story, and was an "excellent witness." There had obviously been a forced entry into the back door with some type of ramming motion. Gong gave the officers a name possibly connected to a prior incident at his house, but he did not give appellant's name.

**Search of Jeff Lawson's House**

Detective Powers of the Porterville Police Department investigated the robbery and received the names of several people who might be involved. Gong heard from someone that Josh Somerset was possibly involved in the robbery.

On December 15, 2003, Detective Powers received information that the possible suspects were at Jeff Lawson's house in Porterville. Powers went to the residence without a search warrant and watched the outside of the house. A man and woman walked out of the house and refused to speak with Powers, and they drove off in a large black truck at a very high rate of speed. Powers tried to catch up with the black truck, but it traveled over 50 miles per hour through the residential area. Powers obtained the vehicle's license plate number and determined the vehicle's occupants were Josh Somerset and Misty Shores. Powers called for assistance with the pursuit and then returned to Lawson's house.

Detective Powers approached Lawson's front door and knocked, but no one responded. Powers walked to the side of the house, where the trash cans were located, and found cardboard boxes and two black utility-style vests on the ground. There was yellow stenciling on the back of one vest, and the word "sheriff" was misspelled. The vests were wet, as if someone tried to wash off the spelling error.

Detective Powers returned to her car and requested backup assistance. As she waited in her car, Deon Duke drove up and parked at the house. Jeff Lawson and Eric Coleman also arrived at the residence.

Detective Powers had to leave the area and Sergeant Larry Rodriguez continued the surveillance at Lawson's house. Officer Rodriguez made contact with Lawson, Coleman, and Duke outside the house, and went inside with them. Rodriguez testified appellant, Billy Hyder, and Jason Conley were in the living room, and the television and a police scanner were on. Conley identified himself as "Joe Martinez," but Officer Rodriguez found Conley's photographic identification under the sofa.

Detective Powers returned and conducted a consent search of the entire house except for the room occupied by Josh Somerset, who refused consent. The police took separate photographs of appellant, Coleman, Conley, Hyder, Lawson, and Duke for identification [*10] purposes. Appellant's head was shaved and he did not have any facial hair, and there was a small cut on his left eyebrow. The record infers that appellant was not taken into custody after the search of Lawson's house.

**Search of Kathy Johns's House**

In mid-December 2003, appellant and Melba Appleton moved into Kathy Johns's house in Porterville. Johns testified that appellant "came and went," and he stayed in a particular bedroom and kept his property in there. Appellant and Melba arrived with a couple of suitcases, and a big "bag-like thing" with wheels, like "one of the little duffel bag-like suitcase things with a handle." Johns testified that Billy Hyder stayed with appellant one night.

On December 22, 2003, Johns told appellant that her family was arriving for Christmas and he needed to find a new place to stay. Appellant left sometime that day, and said he would return to collect his belongings.

On the morning of December 23, 2003, Detectives Powers, Azevedo and other officers executed a search warrant for drugs at Johns's house. Johns and her minor son were present, but appellant was not there. The officers found indicia of drug activities, including a police scanner, pay-owe sheets, syringes, bindles and glass pipes with

white residue, a mirror and straw, and some packaging materials. The white residue tested positive for methamphetamine. There were no weapons in the house.

The officers also recovered several items from the bedroom which appellant had used: identification cards and paperwork with appellant's name, black ballistic-style sizing vests, 2 a two-way radio, a cell phone, binoculars, three 16-gauge shotgun shells, nine 12-gauge shells, one 9-millimeter round, and five casual photographs of appellant and other people. In the bedroom closet, the officers found two stacks of comic books; the count was 193 comic books. The shotgun shells were not in a box but laying loosely on a table in appellant's bedroom.

FOOTNOTES

2 As explained post, the "sizing vests" are used to measure police officers to fit into ballistic bulletproof vests.

END FOOTNOTES

Detective Powers testified some of the comic books were wrapped in plastic, and she believed they might belong to Gong. Powers immediately contacted Gong by telephone, and he provided a more specific description of his stolen comic books. Powers asked Kathy Johns about the comic books, and she said appellant and Melba brought them into the residence.

Later that day, Gong examined the comic books and identified them as his property. Powers testified that she returned the comic books to Gong, and did not have them tested for fingerprints because the black powder would have damaged Gong's property.

**Appellant's Statement**

On or about December 29, 2003, appellant was taken into custody in Las Vegas.

On January 5, 2004, Detective Azevedo and Sergeant Blain interviewed appellant for one hour at the Clark County Jail in Las Vegas, Nevada. Appellant was advised of the warnings pursuant to Miranda v. Arizona (1966) 384 U.S. 436, 16 L. Ed. 2d 694, he agreed to answer questions, and Detective Azevedo started the tape recorder. Azevedo testified that later in the interview, he turned off the tape recorder at appellant's request, and appellant said he was concerned about being labeled a "tattletale." Appellant wanted to make sure that any information about other subjects was not disclosed. Azevedo and Blain also testified that when they flipped over the tape, the recorder malfunctioned and the second half of the interview was not recorded.

The officers told appellant that syringes and drug paraphernalia were found at Kathy Johns's house. Appellant said that he brought everything to her house and he was willing to accept responsibility for it. The officers then asked appellant about the comic books found at Kathy Johns's house. Appellant said that a month earlier, he traded some drugs to get the comic books. Appellant also said he heard from the person who gave him the comic books that they belonged to "Mr. Gong." 3 The officers asked appellant who gave him the comic books, and appellant replied, "'I'm not going to answer that.'" Appellant never denied that he had stayed at Johns's house.

FOOTNOTES

3 At trial, it was established that the transcript of appellant's interview did not contain the reference to "Mr. Gong," but instead stated his response was "'From Mr. Inaudible.'" Detective Azevedo testified that appellant said he heard the comic books were from "Mr. Gong."
END FOOTNOTES

Detective Azevedo asked appellant about the other items found in Kathy Johns's house, and appellant admitted the syringes and glass pipes belonged to him. Appellant said the black vests "had been stolen from a uniform shop in Bakersfield, VIP Uniforms." Appellant said police patches and uniform shirts were also taken from the uniform shop, and they were thrown in a dumpster "to get rid of 'em." Appellant said he was not involved in the burglary, and would not say who was involved. Detective Azevedo and Sergeant Blain testified this exchange was not tape-recorded, because it occurred after they flipped over the tape.

Detective Azevedo asked appellant about the black vests found outside Lawson's house. Appellant said the vests were supposed to be thrown away with the shirts, but someone left the vests in a car and just laid them outside Lawson's house for an unknown reason. Appellant would not identify this person.
"Q. Now, during the interview with [appellant], how did he respond when you would ask him whether he committed the robbery at David Gong's house?

"A. He never denied it. Most of his statements in regards to that were something to the effect of I won't admit to that." Azevedo testified this exchange also occurred when he flipped over the tape and was not recorded.

Detective Azevedo confronted appellant with the fact that they found the comic books in his room at Johns's house. Appellant replied that was "only receiving stolen property." Azevedo also confronted appellant with the fact that he had been identified in a photographic lineup, and that he had the comic books and some of the stolen uniforms. Appellant replied: "'But the vests were never seen. How were the vests ever seen?'" The officers asked appellant how he knew the vests were never seen. Appellant replied: "'Kind of a catch 22 there, ain't it?'"

Detective Azevedo asked appellant who participated in the David Gong incident. Appellant replied: "'I-I can't tell you guys that. How am I gonna sit here and say oh, yeah, we did this and I did it with so and so. I can't do that. That would be completely stupid on my part.'" Appellant also said: "'I'm not gonna admit to doing, at least I'm gonna try not to admit to doing anything,'" and "'I'm not gonna sit here and tell on myself.'" Sergeant Blain said that appellant was actually at Gong's house. Appellant replied: "'But I'm not going to admit that,'" and "'I'm not going to admit to doing Gong." Appellant said "'I'm not going to admit to it'" and "'I'm not even saying that I did it'" more than one time during the interview. Sergeant Blain asked appellant who else was involved in the Gong incident. Appellant replied, "'When you say who else, that's assuming that I'm taking responsibility. I'm not taking responsibility for Gong.'"

Appellant was asked if he would help the officers get to the bottom of Gong's case. Appellant replied: "'Right, and I'm not gonna sit here and hang myself, either, though, when I think there still could be a chance of some light at the end of the fucking tunnel.'" Appellant was asked if Alex Rosales was involved, and appellant said no. Appellant was asked if Eric Coleman was involved, and appellant replied: "'You guys are doing your job.'" Appellant said that he fled Porterville immediately after Kathy Johns's house was searched, and headed toward Las Vegas or Arizona to avoid being caught by the police.

**The Charges**

Appellant and codefendants Jeff Coleman and Billy Hyder were initially charged together with count I, first degree residential robbery of Gong; count II, conspiracy to commit first degree residential robbery; and count III, receiving stolen property, a chest, comic books, and cash. Appellant was separately charged with count IV, receiving stolen property, the comic books; and count V, felon in possession of ammunition. Appellant was charged with firearm and on-bail enhancements, and Coleman and Hyder were alleged to have suffered prior strike and serious felony convictions.

The court granted Hyder's motion for severance of his case, and the matter was set to proceed against appellant and Coleman. The court subsequently granted the prosecutor's motion to dismiss as to Coleman; the prosecutor indicated that charges would be refiled against Coleman. The court also granted the prosecution's motion as to appellant to dismiss count III, receiving stolen property (a chest, comic books, and cash), and renumbered the remaining counts.

Thereafter, appellant was tried for count I, first degree robbery, count II, conspiracy to commit first degree robbery, count III, receiving stolen property, the comic books, and count IV, felon in possession of ammunition.

**The Identification Evidence**

The investigating officers testified they showed numerous photographic lineups to David Gong. Gong only saw one array with appellant's photograph, and identified appellant as one of the gunmen. The officers also showed Gong the individual photograph of appellant, taken during the search of Jeff Lawson's house on December 15, 2003, when appellant's hair and goatee were shaved; Gong did not identify appellant from this photograph. Gong also reviewed the casual photographs seized from appellant's room in Kathy Johns's house. He identified appellant from one of those photographs as the gunman.

Gong was shown an array with an older photograph of Alex Rosales, taken in 2000, and Gong initially identified Rosales as one of the gunman. Gong also reviewed a lineup with a more recent photograph of Rosales and did not identify him.

Gong was shown one photographic lineup with Jason Conley's picture. Gong positively identified Conley as the Hispanic gunman. Conley was believed to be half Hispanic and half American Indian. Appellant later testified that Conley was an American Indian.

**Alex Rosales's Testimony**

Alex Rosales testified as a reluctant prosecution witness about the activities at Jeff Lawson's house. On the afternoon of December 5, 2003, Rosales was at Lawson's house and installing a stereo inside Lawson's car. Rosales had been staying at Lawson's house "[o]n and off" for more than a month, and slept on the couch. Rosales testified he was drinking beer and using drugs on that particular day. He had been high and "cranked out" on methamphetamine for two or three days without sleep.

Rosales testified he was friends with appellant, Hyder, Coleman, Lawson, Conley, and Duke. He had known appellant and Hyder for years. On that particular afternoon, appellant, Hyder, and a female named "Tony" were at Lawson's house. Appellant and Hyder were also staying at Lawson's house. Duke had been there earlier but left, and

Rosales never saw Coleman that day.

Rosales testified that around 9:00 p.m. or 10:00 p.m., appellant, Hyder, Lawson, and "Tony" left in Lawson's black car. Rosales testified that one person in the group said they were going to Bakersfield, but Rosales could not remember which person said it. 4 Rosales remained at Lawson's house and spent the night by himself. He was drinking and using "dope," and fell asleep on the couch.

FOOTNOTES

4 As we will discuss in section II, post, appellant asserts that Rosales was improperly permitted to testify to various hearsay statements, and such statements were not admissible under the coconspirator's exception to the hearsay rule. (Evid. Code, § 1223.)

END FOOTNOTES

Rosales testified that appellant, Lawson, Hyder, and "Tony" returned to Lawson's house early the next morning, just before dawn when it was still dark. Rosales woke up when he heard their voices. Duke, Conley, and Coleman were not there. Rosales went into the kitchen and found a blue duffel bag on the kitchen floor. Rosales testified that he joined appellant, Hyder, and Lawson as they opened the duffel bag and removed the contents: six or seven black vests, two long-sleeve blue shirts and two tan shirts, and a clear plastic bag with about 100 brand new patches that said "Bakersfield Police Department." There were also four "sizing vests" that "police use to size bulletproof vests for cops." Rosales testified the shirts and vests were "brand new" and still folded in clear packages, and looked like apparel worn by a "SWAT" team, police officers, or sheriff's deputies. The patches were the type worn on uniforms.

Rosales testified that appellant and Hyder said "they had just stolen [the items] out of a sea train from Bakersfield," outside a uniform store. 5 They returned the apparel into the blue duffel bag and left the bag on the floor. Rosales did not take anything. Rosales testified appellant and Hyder said they were going to "play cops and robbers or something" and "take people's things and shit, you know." Rosales testified appellant and Hyder were laughing and "joking around" when they said that.

FOOTNOTES

5 A "Sea Train" is a container described as a large mobile storage unit, capable of being placed on the back of a flat bed truck, trains, or boats.

END FOOTNOTES

Later that morning, appellant and Hyder gave Rosales a ride to Jason Conley's house in Porterville. The blue bag was still on the kitchen floor when Rosales left Lawson's house. Appellant and Hyder said they were going back to Bakersfield because "they forgot some bolt cutters or something." Rosales spent the rest of the day drinking, and passed out on another friend's couch.

Rosales testified he ended up at his girlfriend's house. On December 8, 2003, his girlfriend called the police and turned him in because he had been drinking, using methamphetamine, possessed a glass pipe, and violated probation. He subsequently

pleaded guilty to possession of the glass pipe.

Rosales remained in custody until December 29, and went back to Lawson's house about a week later. He did not see the blue duffel bag or its contents, and did not look for the items. On cross-examination, Rosales testified that he knew that Gong identified him as one of the gunmen who broke into his house.

**Additional Prosecution Evidence**

Martin Nordin (Nordin), the manager of VIP Uniforms in Bakersfield, testified he was contacted by the Porterville Police Department in late December 2003, and asked to examine several items to determine whether they were from the store. These items included a particular brand and style of "ranger vests" seized from outside Lawson's house, and sizing vests recovered from appellant's bedroom at Kathy Johns's house.

Nordin testified that he immediately recognized the items as the type kept in the store's inventory because the sizing vests were not sold by any other uniform store between Fresno and Los Angeles. These and other types of uniforms were stored in a large "Sea Train" mobile storage unit behind the store. Nordin checked the storage unit and discovered the lock had been cut and the door was ajar. Nordin testified the employees did not regularly check the storage unit unless they needed to retrieve something. Nordin did not realize the storage unit had been burglarized until contacted by the police department. Nordin believed the burglary occurred between Thanksgiving, when he opened the storage unit to retrieve Christmas ornaments, and when he was contacted by the police department.

Nordin determined quite a bit of property was missing from the storage unit, including two boxes of distinctive "ranger vests," about 65 tan shirts, over 100 white uniform shirts without patches, 40 to 45 light blue shirts, about 40 dark blue Bakersfield Police Department shirts, some with patches on the shoulder, sizing vests used to fit officers for ballistic vests, and a box of old patches from the Bakersfield Police Department and other regional police and fire departments. The uniform shirts were individually wrapped in plastic. There were no boots or utility belts missing.

At trial, Gong testified that he immediately recognized the comic books recovered from Kathy Johns's house as his property based on the titles, the story lines, and the plastic covers. The comic books still had the distinctive aroma of camphor since they had been stored in the camphor chest at Gong's house. Gong never recovered the camphor chest or any other property. Gong did not know appellant, Conley, Hyder, Lawson, Rosales, or Coleman. Gong was shown the two vests found outside Lawson's residence, but he said they were not the same vests worn by the gunmen.

Gong testified that in January 2004, he was shown numerous photographic lineups and individual photographs. He identified appellant as the White gunman, and another man as the Hispanic gunman. At trial, Gong testified he was "absolutely positive" appellant was the White gunman who was not wearing a hat.

Gong testified he received a telephone call in February 2004, from a person who asked him not to testify, that they would do anything that needed to be done if he did not testify, and asked what was still missing. Gong replied he did not want his stuff back, and "wasn't about ready to sell my peace of mind for, you know, the little bit of money that they took." Gong testified he was mad after he received this call. 6

FOOTNOTES

6 As we will discuss in section I, post, appellant asserts the court improperly permitted Gong to testify about the anonymous telephone, and that it was inadmissible hearsay.
END FOOTNOTES

Also at trial, Kathy Johns testified the vests and comic books found in her house did not belong to her, there was no ammunition in her house, she never saw anyone bring these things into the house, and she did not know anything about them. Johns denied telling Detective Powers that appellant and Melba brought the comic books into the house. Johns admitted that she kept a police scanner in the living room.

**Defense Evidence**

Appellant recalled Gong as part of his defense case, and asked about the various photographic lineups he reviewed. Gong could not recall which photographic arrays he examined. Gong never said that Josh Somerset was one of the gunmen, but someone told Gong that Somerset was involved. Gong passed this information to the officers.

Gong testified that on the day that the officers recovered his comic books, the officers showed him a photographic lineup and he identified appellant as one of the gunmen. Later that same day, the officers showed him a series of individual photographs, and Gong again identified appellant. Gong testified he was "a hundred percent positive that it's him."

Gong testified that he told the officers that someone had broken into [*26] his house a few months before the armed robbery, and he believed Jason Martinez was involved in that earlier incident. Gong admitted he had a prior conviction in 1997, and thought it was for possession of marijuana and not possession for sale. It was stipulated, however, that Gong's conviction was for possession of marijuana for sale.

Appellant also recalled Detective Powers, and asked about the individual photographs of appellant, Lawson, Duke, Conley, Coleman and Hyder, which were taken during the search of Lawson's house. Powers testified these photographs were shown to Gong. Gong initially picked Conley as the Hispanic gunman, but said the Hispanic gunman "may have been a little bit darker-complected" than Conley.

**Appellant's Trial Testimony**

Appellant testified that he separated from his wife in the summer of 2003, and moved into Lawson's house. Appellant shared a room with Hyder and kept his things in a duffel bag on wheels. Rosales and Coleman lived on and off at Lawson's house. Appellant admitted that "everybody" at Lawson's house used drugs, and appellant started to inject methamphetamine. Appellant had only used marijuana before that time. Appellant admitted he had a prior felony conviction for commercial burglary in 1998 for stealing a 12-pack of beer from a market. It was stipulated that appellant was prohibited by law from owning or possessing a firearm.

Appellant testified that early on the morning of December 7, 2003, he was installing fish tanks in Lawson's house, and trying to hurry because Lawson promised to pay him $ 500 for the job. Appellant was working in the garage when someone banged on the door, and it was Cliff "Trigger" Pruitt. Appellant knew Pruitt because he stayed at Lawson's house a few times, but appellant did not expect him to show up that

morning. Pruitt said he was looking for some methamphetamine and asked if appellant had some. Appellant said yes. Pruitt asked if appellant knew the value of comic books, and appellant said he had no idea. Pruitt produced a "duffel bag type bag" which contained comic books and vests. Pruitt said he "took" the comic books from someone.

Appellant offered Pruitt a sixteenth of an ounce of methamphetamine for the comic books. Appellant only had a quarter ounce, however, and gave Pruitt half of his stash. Pruitt took the comic books out of the bag and left them on the garage floor, [*28] and "threw in" the vests. Pruitt took the duffel bag with him. Pruitt never mentioned David Gong, or where he got the vests and comic books.

Appellant identified the sizing vests recovered from Kathy Johns's house as the vests which Pruitt left with him. Appellant testified he suspected the comic books had been stolen but did not know that for a fact. Pruitt did not say anything about the vests but appellant "figured" they were probably stolen.

Appellant testified he left the comic books and vests in the garage and continued working on the fish tanks. Appellant finished the project and Lawson paid him. Lawson allowed appellant to borrow his car and drive to San Francisco. The comic books and vests were still in the garage when appellant left for San Francisco later that day. Appellant testified he drove to San Francisco with Billy Hyder, Tony Vangeezbek, and Melba Appleton, and they arrived when it was dark.

Appellant testified he rented a motel room for two nights, and drove back to Porterville on December 9, 2003. Lawson was upset because appellant stayed "a day too long" in San Francisco with his car. Lawson and appellant "got into it" and Lawson kicked appellant out of his house.  The comic books and vests were still in the garage.

Appellant shoved everything he had into his duffel bag, including the comic books and some of the vests, and moved to Kathy Johns's house. He left the other vests in Lawson's garage. Appellant admitted he placed the comic books in the bedroom closet at Johns's house. The bedroom was completely furnished when he moved in, and the shotgun shells and ammunition were already there.

Appellant admitted he was at Lawson's house on December 15, 2003, when the police arrived, even though Lawson had thrown him out the previous week. Appellant explained he was just visiting Hyder and Conley. Appellant admitted he was inside the house when an officer knocked on the door, but stayed inside with Hyder and Conley and did not open the door: "I wouldn't say I was hiding. It was not my house to go open the door." Appellant denied that he quickly shaved his hair and goatee when he realized the police were outside Lawson's house, and claimed he shaved a few days earlier. Appellant did not know the vests were outside Lawson's house when the police arrived, he thought they were in someone's car and going to be dumped.

Appellant testified that he stayed at Kathy Johns's house for about two weeks. He moved into Motel 6 just before Johns's house was searched, and was not there when the police arrived. Appellant testified he later went to Las Vegas to visit his sister, but insisted he was not running from the police and did not think he was a suspect in the Gong case. Appellant knew that Johns's house had been searched, however, and admitted the search was "probably" one of the reasons he went to Las Vegas.

Appellant testified he knew of Gong but did not know where he lived, and had never met or seen him before the trial. When appellant returned from San Francisco, Josh

Somerset told him about the robbery at Gong's house, but appellant denied having any involvement or committing the armed robbery. 7 Appellant was positive that he drove to San Francisco on December 7, 2003, the same day as the Gong robbery. Appellant never heard anything about VIP Uniforms in Bakersfield until he was interviewed by the officers in this case. Appellant denied any involvement in that burglary.

FOOTNOTES

7 Appellant repeatedly tried to testify that Pruitt said he took the comic books from a "chronic dealer," and that Pruitt was referring to David Gong. The court repeatedly ordered appellant's testimony stricken on grounds of relevance and hearsay.

END FOOTNOTES

Appellant admitted he knew Rosales and they were both staying at Lawson's house and using methamphetamine. Appellant denied that he made any of the statements Rosales testified to at the trial: that he was going to Bakersfield to steal from a uniform shop, he was going to tie people up and take their stuff, or he was going to pick up bolt cutters. Appellant denied he saw any of the activities described by Rosales.

Appellant testified he was arrested in Las Vegas around December 29, 2003, and the officers interviewed him on January 5, 2004, about Gong's robbery and the search of Kathy Johns's house. At that time, appellant believed Cliff Pruitt performed the robbery and took the comic books from Gong, but Pruitt was "not a very nice man" and appellant was "scared of retaliation" because Pruitt was wanted for murder. Appellant testified that Pruitt died in January 2004. 8

FOOTNOTES

8 Appellant testified that Pruitt was shot to death by a Tulare County Sheriff's Deputy; the court ordered this testimony stricken on grounds of relevance and speculation.

END FOOTNOTES

Appellant testified he talked with the officers about his fear of naming names and retaliation. Appellant told the officers he strongly believed the comic books belonged to Gong, but complained the officers tried to get him to admit to something he did not do. Appellant admitted the drugs at Johns's house belonged to him. Appellant also admitted that when the officers interviewed him, they asked about the vests and he responded that the vests were never seen. Appellant testified that "it's not that clear to me what I meant right there."

Appellant testified he was positive Coleman and Rosales did not rob Gong. Appellant was part Cherokee, and knew that Jason Conley was an Indian.

Appellant was convicted of robbery, conspiracy, receiving stolen property, and being a felon in possession of ammunition, and the firearm and on-bail enhancements were found true. On appeal, he contends the court improperly permitted Gong to testify about the anonymous telephone call he received, and that much of Rosales's testimony was inadmissible hearsay and not within the coconspirator's exception to the hearsay rule. Appellant also contends he was improperly convicted of both robbery and receiving stolen property.

(Lod. Doc. 4).

**Discussion**

**I.      Jurisdiction and Venue**

A person in custody pursuant to the judgment of a state court may file a petition for a writ of habeas corpus in the United States district courts if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375, n.7 (2000).  Venue for a habeas corpus petition is proper in the judicial district where the prisoner's conviction was entered.  *See* 28 U.S.C. § 2241(d).

Petitioner was convicted in the Tulare County Superior Court in Visalia, California. As Petitioner asserts that he is being held in violation of his rights under the United States Constitution, and because Visalia is within the Eastern District of California, the Court has jurisdiction to entertain Petitioner's petition and venue is proper in the Eastern District.  28 U.S.C. § 84; 28 U.S.C. § 2241(c)(3).

**II.     Standard of Review**

Section 2254 "is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment."  *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126 (9th Cir. 2006) (quoting *White  v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004)).  Under section 2254, a petition for habeas corpus may not be granted unless the state court decision denying Petitioner's state habeas petition "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or  "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly...rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citations omitted).

///

///

1   **III.     Petitioner's Claims**

2   _____**A.  Identification Evidence Claim**

3       Petitioner contends that his conviction violated his right to due process because it was based

4   on identification evidence that was obtained through the use of impermissibly suggestive procedures.

5   (Pet. at 16-17).  Petitioner complains that the victim was shown a picture of Petitioner on December

6   15, 2003 but did not identify Petitioner until he was shown five more pictures of Petitioner on

7   December 23, 2003.  (Pet. at 13).

8       Petitioner raised his identification claim for the first time on collateral review.  Whether the

9   State courts reached the merits of Petitioner's identification claim in adjudicating Petitioner's state

10  habeas petitions is unclear.  (*See* Lod. Doc. 8).  The Court assumes *arguendo* that Petitioner's

11  identification claim is not procedurally barred.[3]  As none of the State court decisions provides a

12  reasoned analysis of Petitioner's identification evidence claim, the Court must conduct an

13  independent review of the record and determine whether the state court's denial of the claim was

14  objectively unreasonable.  *E.g., Himes v. Thompson*, 336 F.3d 848, 852 (9th Cir. 2003).

15      Reliability is the linchpin in determining the constitutionality of a conviction based on

16  identification evidence.  *E.g. Manson v. Brathwaite*, 432 U.S. 98 , 114 (1977).  In order to establish

17  the unconstitutionality of identification evidence, Petitioner must demonstrate that the identification

18  was based on procedures which created "a very substantial likelihood of irreparable

19  misidentification."  *Id.* at 115.  A reviewing court must look to the totality of the circumstances in

20  order to determine whether the admission of identification evidence violated an accused's right to a

21  fair trial.  *See Neil v. Biggers*, 409 U.S. 188, 198 (1972).

22      Petitioner's allegations, even if accepted as true, are insufficient to establish a substantial

23  likelihood of irreparable misidentification.  Petitioner's most coherent complaint is his conclusory

24  statement that "the individual pictures shown of the petitioner prior to the first identification of

25

26  _____

    [3] Respondent contends that Petitioner failed to exhaust his identification claim and also asserts that the claim is subject to
27  procedural bar; because Petitioner's allegations are plainly insufficient to warrant federal habeas relief, the Court need not
    address these issues. 28 U.S.C. § 2254(b)(2) (petition may be denied on the merits notwithstanding failure to exhaust);
28  *Lambrix v. Singletary*, 520 U.S. 518; 524-25 (1997) (noting that court may proceed to merits of a claim where denial is
    obvious in the interest of judicial economy); *Romero v. Furlong*, 215 F.3d 1107, 1111 (10th Cir. 2000) (same).

petitioner is [sic] impermissibly suggestive;" Petitioner follows this statement with a citation to *Foster v. California*, 394 U.S. 440, 442 n. 2 (1969). (Pet. at 17). In *Foster,* the High Court stated that "the practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."[4] *Foster* does not, however, establish a *per se* rule that identification evidence must be excluded where the identification was based on "showing [a suspect] singly" to the identifying witness. *See United States v. Barron,* 575 F.2d 752, 755 (9th Cir. 1978) (rejecting appellant's claim because notwithstanding allegedly suggestive photo line-up procedure, risk of misidentification was slight under totality of circumstances approach set forth in *Biggers*); *see also United States ex rel. Williams v. La Vallee*, 415 F.2d 643, 645 (2nd Cir. 1969) (distinguishing *Foster* on the basis of the multiple factors which rendered the procedure at issue in that case impermissibly suggestive). Initially, the Court notes that Petitioner fails to establish that his picture was shown "singly" to the victim, and the record indicates that the victim was shown an "array" of photos. Even assuming that Petitioner could establish that his photo was shown singly to the victim, viewed in light of the totality of the circumstances surrounding the identification, Petitioner's claim must fail.

The factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199-200. Here, the victim testified that he observed his assailants for a period of ten to fifteen minutes and that he paid close attention to his assailants' faces in anticipation of identifying them to police. The victim also gave a fairly detailed, accurate description of Petitioner and his accomplice. According to the petition, the victim first identified Petitioner on December 23, 2003, approximately two weeks after the crime. (Pet. at 17). Lastly, there is no indication in the record that the victim's photo-based identification of Petitioner was

---

[4] *Foster* also criticized the investigators' practice of causing the same individual be the one constant in repeated line-ups. *Id*. Even with respect to this disfavored practice, there is no *per se* rule requiring exclusion. *Townes v. Murray*, 68 F.3d 840, 853 (4th Cir. 1995) citing *United States v. Portillo*, 633 F.2d 1313, 1324 (9th Cir. 1980), *cert. denied*, 450 U.S. 1043 (1981).

1  equivocal.  In light of the totality of the circumstances, Petitioner cannot demonstrate a very

2  substantial likelihood of irreparable misidentification.

3       The Court also notes that any error in the admission of evidence regarding the victim's out-

4  of-court identification of Petitioner cannot be said to have had a substantial and injurious affect on

5  the jury's verdict.  *Brecht v. Abramson*, 507 U.S. 619, 637 (1995).  Petitioner testified at trial that he

6  was "absolutely positive" that the Petitioner was one of his assailants.   In order to demonstrate

7  prejudice resulting from the trial court's allegedly erroneous admission of evidence of the victim's

8  prior identification, Petitioner would have to establish not only that the photo line-up procedure was

9  unconstitutionally suggestive, but also that the victim's subsequent identification at trial was so

10 tainted by the line-up that his live testimony should have been excluded.  *See, e.g., United States v.*

11 *Wade*, 388 U.S. 218, 241 (1967).  Petitioner fails to even allege that the victim's in-court

12 identification of Petitioner was tainted by the victim's earlier identification.  Accordingly, the State

13 court's denial of Petitioner's identification claim was not objectively unreasonable.

14       **B.  Prosecutorial Misconduct Claim**

15       Petitioner contends that the prosecution perpetrated a "fraud upon the court" by presenting

16 false evidence against Petitioner.  (Pet. at 22).  Petitioner points to six alleged acts of dishonesty by

17 the prosecution: 1) charges against a suspect name Coleman were dismissed for lack of evidence; 2)

18 a suspect named Conely was never charged, although the victim identified Conely in a line-up; 3)

19 Detective Power's testimony, offered by the prosecution, was inconsistent with certain documentary

20 evidence; 4) the prosecutor stated that "there was no mention that the petitioner was building fish

21 tanks, fully knowing that on [a detective's report] specifically stated that he was;" 5) the prosecutor

22 elicited perjury from witness Marty Nordin regarding when Nordin realized that he had been

23 burglarized; and 6) the prosecution failed to reveal to the court that the confidential informant relief

24 upon to obtain a search warrant was a suspect in the robbery.

25       Petitioner raised his prosecutorial misconduct claim for the first time on collateral review.

26 Whether the State courts reached the merits of Petitioner's identification claim in adjudicating

27 Petitioner's state habeas petitions is unclear.  (*See* Lod. Doc. 8).  The Court assumes *arguendo* that

28

1   Petitioner's prosecutorial misconduct claim is not procedurally barred.[5]  As none of the State court

2   decisions provides a reasoned analysis of Petitioner's identification evidence claim, the Court must

3   conduct an independent review of the record and determine whether the state court's denial of the

4   claim was objectively unreasonable.  *E.g., Himes*, 336 F.3d at 852.

5         Petitioner is not entitled to relief on his prosecutorial misconduct claim unless he can

6   establish that the prosecutor's misconduct "so infected the trial with unfairness as to make the

7   resulting conviction a denial of due process."  *E.g. Comer v. Schriro*, 480 F.3d 960, 988 (9th Cir.

8   2007).  None of Petitioner's allegations of misconduct implicate the fundamental fairness of

9   Petitioner's trial.

10         Petitioner's allegations regarding the prosecution's dismissal of charges against Coleman and

11   decision not to charge Conely are insufficient to provide a factual basis for a colorable constitutional

12   claim.  Although Petitioner's allegations are unclear, it appears that Petitioner's contention is that the

13   prosecution suggested to the jury that Conely was Petitioner's accomplice during the commission of

14   the offense despite the prosecution's belief that Conely was not in fact a suspect.  (*See* Pet. at 19).

15   Petitioner's conclusory allegations are insufficient to carry his burden of establishing a constitutional

16   violation, as Petitioner points to no portion of the record in which the prosecution mislead the jury

17   with respect to Conely's involvement in the crime.  Petitioner alleges merely that "the prosecutor had

18   the victim testify that he had identified Conely *and thus argues that Conely was, in fact, the second*

19   *robber*."  (Id.) (emphasis added).  Petitioner erroneously equates the prosecution's presentation of

20   truthful testimony– that the victim had identified Conely– with advancing a theory that Conely was

21   the second robber.  Even assuming the prosecution did improperly suggest that Conely was a suspect

22   despite a subjective disbelieve in his involvement, in light of the powerful evidence of Petitioner's

23   guilt, such a suggestion did not render Petitioner's trial fundamentally unfair.  *See, e.g, Comer*, 480

24   F.3d at 989 (discussing strong evidence of defendant's guilt, including eye-witness testimony, in

25   holding that prosecutor's misconduct did not render trial fundamentally unfair).

26

27

28

---

[5] Respondent contends that Petitioner failed to exhaust his prosecutorial misconduct claim and also asserts that the claim is subject to procedural bar; because Petitioner's allegations are plainly insufficient to warrant federal habeas relief, the Court need not address these issues.

1    Petitioner's contention that the prosecution elicited perjury from Detective Powers also fails

2  to establish a constitutional violation.  Petitioner complains of a fifteen-minute discrepancy in the

3  time-line given by Detective Powers with respect to when she showed the victim five photographs of

4  Petitioner.  (Pet. at 21).  Petitioner presents no evidence that the prosecution was aware that

5  Detective Powers would deliberately give false testimony at trial, and it appears to the Court that the

6  inconsistency between Powers' testimony and a police report concerning the photo line-up was likely

7  no more than the result of a simple lapse in memory.  Accordingly, Petitioner has failed to carry his

8  burden of establishing a constitutional violation.  Further, as discussed above in section III(A),

9  evidence regarding the victim's out-of-court identification of Petitioner cannot be said to have had

10  any substantial impact on the outcome of Petitioner's trial, as the victim testified in court during trial

11  that he was absolutely positive that Petitioner was one of the men who robbed him.

12    Petitioner complains that a police report supported Petitioner's claim that he was building

13  fish tanks and therefore that the prosecutor improperly stated that there was no "prior mention" of

14  Petitioner's fish tank building.  Petitioner's claim lacks merit.  Assuming that the prosecutor's

15  comment regarding Petitioner's fish tank defense was improper, in light of the evidence presented

16  against him, Petitioner fails to establish that the statement so infected Petitioner's trial with

17  unfairness that he was denied due process of law.  Similarly, Petitioner's claim regarding the

18  testimony of Marty Nordin is insufficient to establish fundamental unfairness.  Petitioner presents no

19  evidence that the prosecution knowingly elicited untruthful testimony from Nordin, in fact, Petitioner

20  fails to establish the falsity of Nordin's testimony.  Finally, Petitioner's claim regarding the

21  prosecution's failure to disclose the fact that its confidential informant was a suspect in the crime

22  during a search warrant hearing fails to state a claim for federal habeas relief.  Disclosure of the fact

23  that the confidential informant was also likely involved in the crime would not have undercut

24  probable cause for the search warrant, to the contrary, it would have likely bolstered the reliability of

25  the informant's information.

26    The State court's rejection of Petitioner's prosecutorial conduct claim was not objectively

27  unreasonable, as none of Petitioner's allegations of "fraud" establish improper conduct on behalf of

28  the prosecution, let alone conduct which so infected the trial with unfairness as to make the resulting

1   conviction a denial of due process; this is especially true in light of the overwhelming evidence of

2   Petitioner's guilt presented at trial.  Accordingly, Petitioner is not entitled to relief on his

3   prosecutorial misconduct claim.

4   **C.  Ineffective Assistance of Counsel Claims**

5   **1. Trial Counsel**

6   Petitioner contends that his trial counsel provided constitutionally ineffective assistance.

7   (Pet. at 26).  Specifically, Petitioner complains that counsel failed to ask petitioner where he was at

8   the time of the crime, failed to challenge the prosecution's identification evidence, failed to object

9   when the prosecution elicited testimony that Petitioner had shaved his head and goatee, failed to

10  object to the prosecution's comment on Petitioner's post-arrest silence and improper characterization

11  of the evidence with respect to Petitioner's alibi defense, failed to call Conely as a witness, failed to

12  discover that Detective Powers was in business with another suspect's wife, failed to discover that

13  the trial judge was friend's with the victim's mother, and failed to call Melba Appleton as an alibi

14  witness.

15  Petitioner raised his ineffective assistance of counsel claim for the first time on collateral

16  review.  Whether the State courts reached the merits of Petitioner's ineffective assistance of counsel

17  claim in adjudicating Petitioner's state habeas petitions is unclear.  (*See* Lod. Doc. 8).  The Court

18  assumes *arguendo* that Petitioner's ineffective assistance of counsel claim is not procedurally

19  barred.[6]  As none of the State court decisions provides a reasoned analysis of Petitioner's claim, the

20  Court must conduct an independent review of the record and determine whether the state court's

21  denial of the claim was objectively unreasonable.  *E.g., Himes*, 336 F.3d at 852.

22  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court

23  must consider two factors.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Lowry v. Lewis*, 21

24  F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's representation fell below

25  an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that

26

27  ───────────────

28  [6] Respondent contends that Petitioner failed to exhaust his ineffective assistance claim and also asserts that the claim is subject to procedural bar; because Petitioner's allegations are plainly insufficient to warrant federal habeas relief, the Court need not address these issues.

1    were not the result of reasonable professional judgment considering the circumstances. *Strickland,*

2    466 U.S. at 688; *United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995).  Second, the

3    petitioner must demonstrate that "there is a reasonable probability that, but for counsel's

4    unprofessional errors, the result ... would have been different." *Id*. at 694.  A court evaluating an

5    ineffective assistance of counsel claim does not need to address both components of the test if the

6    petitioner cannot sufficiently prove one of them.  *Id.* at 697; *Thomas v. Borg*, 159 F.3d 1147,

7    1151-52 (9th Cir. 1998).

8            Petitioner cannot establish that he was prejudiced by his counsel's alleged failure to ask

9    petitioner where he was at the time of the crime.  The record demonstrates that Petitioner's version

10   of the facts was that he was installing fish tanks at the time of the crime.  Petitioner testified to this

11   effect during trial, and the jury rejected Petitioner's version of the facts.  Accordingly, there is no

12   reasonable probability that, had Petitioner's counsel asked him where he was at the time of the

13   crime, the outcome of Petitioner's trial would have been more favorable.

14           Similarly, Petitioner cannot establish that he was prejudiced by his counsel's failure to object

15   to the evidence regarding whether Petitioner shaved his head and goatee.  Petitioner fails to identify

16   any basis for a colorable objection to the shaving testimony, and it is unlikely that an objection

17   would have been sustained in any event.  Further, in light of the wealth of evidence presented against

18   Petitioner at trial, such as the victim's in-court identification and the fact that Petitioner was in

19   possession of the victim's stolen property, there is no reasonable probability that, had Petitioner's

20   counsel objected to the shaving testimony, the outcome of Petitioner's trial would have been more

21   favorable.

22           Nor can Petitioner establish that he was prejudiced by his counsel's failure to object to the

23   prosecution's identification evidence.  As discussed above, Petitioner fails to establish that the

24   identification procedure employed by investigators was impermissibly suggestive.  Further, given the

25   victim's in-court identification of Petitioner as his assailant, there is no reasonable probability that

26   the outcome of Petitioner's trial would have been more favorable had counsel objected to the prior

27   identification evidence.

28   ///

1    Petitioner's claim that counsel was ineffective for failing to object to the prosecution's

2    comment on his "post-arrest silence" lacks merit.  Petitioner points to no portion of the record which

3    supports his contention that the prosecutor made any comment on Petitioner's post arrest silence

4    Further, Petitioner did not invoke his right to remain silent but instead chose to speak to

5    investigators.  As discussed in section III(B) above, Petitioner's related claim regarding the

6    prosecution's mischaracterization of the evidence regarding Petitioner's fish tank alibi must fail

7    because Petitioner cannot establish that he was prejudiced by the prosecutor's comment.

8    Petitioner fails to present sufficient evidence to establish prejudice resulting from counsel's

9    decision not to call Conely as a defense witness, as Petitioner presents no evidence as to what

10   testimony Conely could have provided.  *See, e.g., United States v. Bagnell*, 259 Fed. Appx. 925, 926

11   (9th Cir. 2007) (rejecting claim where there was no evidence as to what testimony witnesses would

12   have provided).  With respect to counsel's failure to call Melba Appleton as an alibi witness, the

13   Court notes that Ms. Appleton's testimony is not wholly consistent with Petitioner's version of the

14   facts.  Petitioner avers that he was installing fish tanks at the time of the crime, but Ms. Appleton's

15   statement makes no reference to fish tanks.  To the contrary, Ms. Appleton's statement indicates that

16   in the early morning hours of the day in question, she and Petitioner were searching the internet.

17   (Pet. at 65, 69).  Further, the veracity of Ms. Appelton's statement is doubtful, as during her

18   interview with an investigator, she stated that the basis of her belief that she was with Petitioner on

19   the day of the crime was that Petitioner and another person told her so.  (Id. at 68).  Had Ms.

20   Appelton testified at trial, she likely would have been impeached with statements she made to the

21   investigator such as "well, all I know is that I was with [Petitioner] that morning it supposedly

22   happened and I know they didnt go anywhere or anything.  But I don't know if they did it or not

23   cause I didnt see them do anything." (Id. at 70).  In light of credible evidence presented against

24   Petitioner, there is no reasonable probability that Ms. Appelton's equivocal testimony would have

25   rendered the outcome of Petitioner's trial more favorable.

26   Finally, Petitioner presents no evidence to substantiate his claims regarding the relationships

27   between Detective Powers and another suspect's wife or the trial judge and the victim's mother.

28   Assuming such relationships existed, Detective Powers could have possibly been impeached

regarding his relationship with another suspect's wife, and the trial judge may have granted a motion

for recusal.  However, Petitioner cannot possibly establish that the outcome of his trial would have

been more favorable had another judge presided over his case, as Petitioner does not allege, let alone

present evidence, that the trial judge was actually biased against him.  Further, in light of the victim's

testimony and Petitioner's possession of the victim's stolen property, even a successful impeachment

of Detective Powers is not reasonably likely to have changed the outcome of Petitioner's trial.

In light of the evidence presented against Petitioner at trial and the lack of evidence presented

in support of Petitioner's ineffective assistance of counsel claims, the State court's rejection of

Petitioner's ineffective assistance of counsel claims was not objectively unreasonable.  Accordingly,

Petitioner is not entitled to relief on any of his ineffective assistance of trial counsel claims.

### 2. Appellate Counsel

Petitioner contends that, to the extent any of the issues raised in his state habeas actions were

untimely, it was due to his appellate counsel's ineffective assistance in failing to raise such issues on

direct review.  (Pet. at 34-35).  Because Petitioner is not entitled to relief on any of the claims

identified in his ineffective assistance of appellate counsel section, Petitioner cannot establish that

his appellate counsel's performance prejudiced him in any way.

### Certificate of Appealability

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

district court's denial of his petition, and an appeal is only allowed in certain circumstances.  *Miller-*

*El v. Cockrell*, 123 S.Ct. 1029, 1039 (2003).  The controlling statute in determining whether to issue

a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

> (A) the final order in a habeas corpus proceeding in which the detention complained

1   of arises out of process issued by a State court; or

2   (B) the final order in a proceeding under section 2255.

3   (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

4
5   (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

6   28 U.S.C. § 2253.

7   If a court denies a petitioner's petition, the court may only issue a certificate of appealability

8   "if jurists of reason could disagree with the district court's resolution of his constitutional claims or

9   that jurists could conclude the issues presented are adequate to deserve encouragement to proceed

10   further." *Miller-El*, 123 S.Ct. at 1034; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). While the

11   petitioner is not required to prove the merits of his case, he must demonstrate "something more than

12   the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 123 S.Ct. at

13   1040.

14   In the present case, the Court finds that reasonable jurists would not find the Court's

15   determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or

16   deserving of encouragement to proceed further. Petitioner has not made the required substantial

17   showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a

18   certificate of appealability.

19

20   **Order**

21   Accordingly, it is HEREBY ORDERED that:

22   1) The petition for writ of habeas corpus is DENIED with prejudice;

23   2) The Clerk of Court is DIRECTED to enter judgment for respondent;

24   3) The Court DECLINES to issue a certificate of appealability.

25   IT IS SO ORDERED.

26   **Dated:   April 5, 2010**                              **/s/ John M. Dixon**
                                                    UNITED STATES MAGISTRATE JUDGE

27

28